## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROBERT W. MAUTHE, M.D., P.C., a   )
Pennsylvania corporation, individually and   )
as the representative of a class of   )
similarly-situated persons,   )
  )
    Plaintiff,   )
  )
v.   )
  )
SPREEMO, INC. and THE HARTFORD   )
FINANCIAL SERVICES GROUP,   )
  )
    Defendants.   )

Case No. 5:18-cv-01902-LS

CLASS ACTION

Chief Judge Lawrence F. Stengel

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff Robert W. Mauthe, M.D., P.C. ("Mauthe" or "Plaintiff") brings this action on behalf of itself and all other persons similarly situated and, except for those allegations pertaining to Plaintiff or its attorneys that are based upon personal knowledge, alleges the following upon information and belief against defendants Spreemo, Inc. ("Spreemo") and The Hartford Financial Services Group ("Hartford") (collectively "Defendants"):

## PRELIMINARY STATEMENT

1.  Defendants have sent advertisements by facsimile in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227, and the regulations that the Federal Communications Commission ("FCC") has prescribed thereunder, 47 C.F.R. § 64.1200 (collectively, the "TCPA").

2.  Defendants sent Plaintiff at least one advertisement by facsimile and in violation of the TCPA. Exhibit A. Plaintiff did not expressly consent to receive

Defendants' advertisement by fax and does not have an established business relationship with Defendants.

3.      Plaintiff brings this action against Defendants on behalf of a class of all persons or entities to which Defendants sent one or more telephone facsimile messages ("faxes") promoting Spreemo's services—locating, recommending and/or scheduling services with radiological imaging providers for patients who are direct or indirect insureds under policies of insurance written, underwritten or issued by Hartford—seeking statutory damages for each violation of the TCPA, trebling of the statutory damages if the Court determines Defendants' violations were knowing or willful, injunctive relief, compensation and attorney fees (under the conversion count), and all other relief the Court deems appropriate under the circumstances.

4.      Defendants' unsolicited faxes damaged Plaintiff and the other class members. Unsolicited faxes tie up the telephone lines, prevent fax machines from receiving authorized faxes, prevent their use for authorized outgoing faxes, cause undue wear and tear on the recipients' fax machines, and require additional labor to attempt to discern the source and purpose of the unsolicited message. The recipient of a "junk" fax loses the use of its fax machine, and many lose their paper and ink toner in printing the fax. Such an unsolicited fax interrupts the recipient's privacy. A junk fax wastes the recipient's valuable time that would have been spent on something else.

5.      Defendant Spreemo is a business organization whose profit-based business model involves the provision of contracted services on behalf of insurers

whereby medical providers whose patients are in need of radiological imaging communicate with Spreemo about such patient imaging needs, and depending upon which insurer is responsible for coverage and payment for such radiological imaging services, Spreemo selects and schedules the patient's radiological imaging with a radiological imaging provider "preferred" by that insurer.

6.      Hartford is an insurance company in the business of selling insurance products, such as insurance policies that provide coverage and payment for medical services, including but not limited to radiological imaging, for patients covered under insurance policies that Hartford writes, underwrites and/or issues.

## PARTIES, JURISDICTION, AND VENUE

7.      Plaintiff is a private medical practice in Center Valley, Pennsylvania.

8.      On information and belief, Spreemo is a Delaware corporation with its principal place of business in New York, New York.

9.      On information and belief, Hartford is a Delaware corporation with its principal place of business in Hartford, Connecticut.

10.     The Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 47 U.S.C. § 227.

11.     Personal jurisdiction exists over Defendants in Pennsylvania because Defendants have transacted business and committed tortious acts within the State of Pennsylvania, and the claims sought to be prosecuted in this action arise out of or relate to Defendants contacts with the State of Pennsylvania.

12.     Venue is proper in the Eastern District of Pennsylvania, because

3

Defendants committed statutory torts within this District and a significant portion of the events took place here.

**FACTS**

13.     Defendants sent advertisements by facsimile to Plaintiff and a class of similarly-situated persons. Whether Defendants did so directly or with the assistance of a third party (yet unknown to Plaintiff), Defendants are directly liable for violating the TCPA.

14.     Plaintiff has received at least one of Defendants' advertisements by facsimile. A true and correct copy of the fax Plaintiff received in December, 2016, is attached as Exhibit A.

15.     Exhibit A is a one-page document that Defendants sent by fax promoting Spreemo's services locating, recommending and/or scheduling radiological imaging providers for patients insured, directly or indirectly, under policies of insurance written, underwritten and/or issued by Hartford.

16.     Exhibit A prominently displays Spreemo's name, logo, telephone number, fax number, address, email address, and website in bold font.

17.     Exhibit A promotes the commercial availability or quality of services available from Spreemo for patients of fax recipients insured, directly or indirectly, under policies of insurance written, underwritten and/or issues by Hartford by stating that Spreemo looks "forward to a strong partnership and providing exceptional care for The Hartford patients."

18.     Exhibit A promotes the availability and quality of Spreemo's services

4

by stating that Spreemo is the "Primary Diagnostic Vendor" for Hartford.

19.     In the event that one or both Defendants sought to invoke the exemption from TCPA liability for advertising faxes sent to persons with whom Defendants may claim to have had established business relationships ("EBRs"), such exemption would be unavailable to Defendants in this case because Exhibit A does not include the opt-out notice required by the TCPA as a precondition to the invocation of an EBR defense or exemption. *See* 47 U.S.C. § 227 (b) (2) (D) & (E); 47 C.F.R. § 64.1200 (a) (4) (iii) & (v).

20.     On information and belief, Defendants sent advertisements by facsimile to Plaintiff and more than 39 other persons in violation of the TCPA.

21.     Plaintiff and the other class members owe no obligation to protect their fax machines from Defendants. Their fax machines are ready to send and receive their urgent communications, or private communications about patients' medical needs, not to receive Defendants' unlawful advertisements.

## CLASS ACTION ALLEGATIONS

22.     Plaintiff brings this action as a class action on behalf of itself and all others similarly situated as members of a class, initially defined as follows:

> Each person or entity that was sent one or more telephone facsimile messages ("faxes") on or after May 7, 2014, offering Spreemo's diagnostic vending services for person's insured, directly or indirectly, under insurance policies written, underwritten and/or issued by Hartford.

Plaintiff anticipates modifying the proposed class definition—including proposing subclasses if appropriate—after discovery as to the scope of Defendants' fax advertising practices and any potential affirmative defenses Defendants may raise.

23.     Excluded from the class are Defendants, each of Defendants' officers, directors, legal representatives, heirs, successors, and assigns, any entity in which either Defendant has a controlling interest, any parent, subsidiary or affiliated company of either Defendant, and any Judge assigned to this action, including his or her immediate family.

24.     In this action, Plaintiff intends to discover, include, and resolve the merits of claims about all facsimile advertisements sent by or on behalf of Defendants to Plaintiff, as well as all facsimile advertisements sent by or on behalf of Defendants to the other class members.

25.     Defendants' fax advertising program involved other, substantially-similar advertisements sent to increase the purchase or use of Defendants' products and services. Plaintiff intends to locate those advertisements in discovery. *See* Exhibit B, a Demand for Preservation of All Tangible Documents Including Electronically Stored Information.

26.     This action is brought and may properly be maintained as a class action pursuant to Fed. R. Civ. P. 23. This action satisfies Rule 23 (a)'s numerosity, commonality, typicality, and adequacy requirements. Additionally, prosecution of Plaintiff's claims separately from the putative class's claims would create a risk of inconsistent or varying adjudications under Rule 23 (b) (1) (A). Furthermore, the questions of law or fact that are common in this action predominate over any individual questions of law or fact making class representation the superior method to adjudicate this controversy under Rule 23 (b) (3).

27. **Numerosity/impracticality of joinder.** On information and belief, the class consists of more than 39 persons and, thus, is so numerous that individual joinder of each member is impracticable. The precise number of class members and their identities are unknown to Plaintiff, but will be obtained from Defendants' records or the records of third parties.

28. **Commonality and predominance.** There is a well-defined community of interest and common questions of law and fact that predominate over any questions affecting only individual members of the class. These common legal and factual questions, which do not vary from one class member to another, and which may be determined without reference to the individual circumstances of any class member, include, but are not limited to the following:

      a.    Whether Exhibit A and other yet-to-be-discovered facsimiles sent by or on behalf of Defendants advertised the commercial availability or quality of property, goods or services;

      b.    Whether Defendants sent advertisements by facsimile promoting the commercial availability or quality of property, goods, or services;

      c.    The manner and method that Defendants used to compile or obtain the list(s) of fax numbers to which fax advertisements were sent;

      d.    Whether Plaintiff and the other class members should be awarded statutory damages;

      e.    If the Court finds that either or both Defendants willfully or

knowingly violated the TCPA, whether the Court should exercise its discretion to increase the amount of the statutory damages award to an amount equal to not more than three times the amount;

      f.      Whether the Court should enjoin either or both Defendants from faxing advertisements in the future; and

      g.      Whether either or both Defendant's conduct as alleged herein constituted conversion.

29.    **Typicality of claims.** Plaintiff's claims are typical of the claims of the other class members because Plaintiff and all class members were injured by the same wrongful practices. Plaintiff and the members of the class were sent Defendants' advertisements by facsimile and those advertisements did not contain the opt-out notice required by the TCPA. Under the facts of this case, because the focus is upon Defendants' conduct, if Plaintiff prevails on its claims, then the other putative class members will prevail as well.

30.    **Adequacy of representation.** Plaintiff is an adequate representative of the class because its interests do not conflict with the interests of the class it seeks to represent. Plaintiff has retained undersigned counsel, who are competent and experienced in complex class action litigation, and in TCPA litigation in particular, and Plaintiff intends to vigorously prosecute this action. Plaintiff and its counsel will fairly and adequately protect the interest of members of the class.

31.    **Prosecution of separate claims would yield inconsistent results.** Even though the questions of fact and law in this action are predominantly common to

8

Plaintiff and the putative class members, separate adjudication of each class member's claims would yield inconsistent and varying adjudications. Such inconsistent rulings would create incompatible standards for Defendants to operate under if/when class members bring additional lawsuits concerning the same unsolicited fax advertisements, or if one or both Defendants choose to advertise by fax again in the future.

32.     **A class action is the superior method of adjudicating the common questions of law or fact that predominate over individual questions.** A class action is superior to other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the claims of all class members is economically unfeasible and procedurally impracticable. The likelihood of individual class members prosecuting separate claims is remote, and even if every class member could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action. Relief concerning Plaintiff's rights under the laws herein alleged and with respect to the class would be proper. Plaintiff envisions no difficulty in the management of this action as a class action.

## COUNT I
## TELEPHONE CONSUMER PROTECTION ACT, 47 U.S.C. § 227

33.     Plaintiff incorporates the preceding paragraphs as though fully set forth herein.

34.     Plaintiff brings Count I on behalf of itself and a class of similarly-

situated persons against Defendants.

35.     The TCPA prohibits the "use of any telephone facsimile machine, computer or other device to send an unsolicited advertisement to a telephone facsimile machine…." 47 U.S.C. § 227 (b) (1).

36.     On information and belief, Defendants or third parties on behalf of Defendants sent <u>Exhibit A</u> to the facsimile machines of Plaintiff and others similarly situated using a telephone facsimile machine, computer, or other device.

37.     The TCPA defines "unsolicited advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's express invitation or permission." 47 U.S.C. § 227 (a) (4).

38.     <u>Exhibit A</u> promotes the commercial availability or quality of Spreemo's contracted services of locating, recommending and/or scheduling radiological imaging for patients who are insured, directly or indirectly, under insurance policies written, underwritten and/or issued by Hartford.

39.     <u>Exhibit A</u> informs recipients (*i.e.*, medical providers such as Plaintiff) that when they are treating patients covered by Hartford insurance policies, Spreemo is Hartford's primary diagnostic testing vendor.

40.     <u>Exhibit A</u> communicates to recipients (*i.e.*, medical providers such as Plaintiff) that if they have a patient covered by a Hartford insurance policy that needs a diagnostic test such as an MRI, they should submit the request for an MRI to Spreemo.

41.     If and when recipients of Exhibit A (*i.e.*, medical providers such as Plaintiff) submit such a request to Spreemo (*e.g.*, for an MRI), Spreemo will then contact an MRI provider that is approved by Hartford to schedule the MRI study. *Id.*

42.     Spreemo describes its contractual services to insurers, such as Hartford, as "[h]elping … payers [*i.e.*, insurers] find the best value." Exhibit C, Spreemo Website at https://www.spreemohealth.com/, p. 6 (last visited Aug. 16, 2018).

43.     Spreemo describes its contractual services to insurers, such as Hartford, as "work[ing] with employers and payers [*i.e.*, insurers] to connect their members with the highest-value radiology providers nationwide, improving outcomes for patients," and represents that such services "reduc[e] total medical spend [*i.e.*, payout] for payers [*i.e.*, insurers]." Exhibit D, https://angel.co/spreemohealth, at p. 2 (last visited on Aug. 16, 2018).

44.     Spreemo touts that its contractual services to insurers, such as Hartford, "lower[] employer healthcare spend [*i.e.*, monetary payout] through the reduction of inappropriate and unnecessary care," Exhibit E, Spreemo LinkedIn Web Page at https://www.linkedin.com/company/spreemo/ (last visited Aug. 16, 2018), thus making insurance policies written, underwritten, issued and/or sold by such insurers more marketable and thereby increasing insurer business volume and profits, or alternatively, for self-insured employers, making Spreemo's services more attractive because they save such employers money.

45.     Defendants sent <u>Exhibit A</u> to Plaintiff and other members of the class for the purpose, and with the expectation, of obtaining indirect financial or monetary gain (or savings), in that, upon information and belief:

a.     Spreemo provides the aforementioned services pursuant to a contract with Hartford, and Spreemo receives financial or monetary gain under or through said contract when medical providers receiving the subject fax comply with its solicitation to submit requests for radiological imaging to Spreemo for location, recommendation and scheduling; and

b.     Hartford receives financial or monetary gain (or savings) under or through said contract when Spreemo provides the aforementioned contractual services because Spreemo locates, recommends and schedules such radiological imaging with providers whom Hartford has designated as "preferred" and who—either by virtue of their lower agreed costs charged to and paid by Hartford for such radiological imaging, or by virtue of their radiological interpretations influencing the selection of more costly versus less costly treatment modalities for the patients—reduce Hartford's payout under the insurance policies providing coverage for such radiological imaging.

46.     Spreemo sent the subject fax, or caused it to be sent, but Hartford is also liable as a sender of the subject fax because the fax was sent on its behalf, it is in contractual privity with Spreemo with regard to the specific services promoted in the fax, it intended or expected to receive financial benefit from the sending of the fax, it expressly or impliedly authorized the fax to be sent, or it approved the

radiological imaging providers to whom Spreemo would recommend Hartford-insured patients, and with whom Spreemo would schedule radiological imaging for such patients, creating Spreemo's apparent authority to send the fax on Hartford's behalf.

47.     Plaintiff did not expressly give permission or invitation to receive any advertisement from either Defendant by fax.

48.     The TCPA provides a private right of action as follows:

> 3.     <u>Private right of action</u>. A person may, if otherwise permitted by the laws or rules of court of a state, bring in an appropriate court of that state:
>
> > (A)     An action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation,
> >
> > (B)     An action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or
> >
> > (C)     Both such actions.

47 U.S.C. § 227 (b) (3).

49.     The Court, in its discretion, may treble the statutory damages if it determines that a violation was knowing or willful. 47 U.S.C. § 227 (b) (3).

50.     Here, Defendants violated 47 U.S.C. § 227 (b) (1) (C) by sending an advertisement by facsimile (such as <u>Exhibit A</u>) to Plaintiff and the other class members without their prior express invitation or permission.

51.     Facsimile advertising imposes burdens on recipients that are distinct from the burdens imposed by other types of advertising. The required opt-out notice

provides recipients the necessary information to opt-out of future fax transmissions, including a notice that the sender's failure to comply with the opt-out request will be unlawful. 47 C.F.R. § 64.1200 (a) (4) (iii).

52.     The TCPA is a strict liability statute and Defendants are liable to Plaintiff and the other class members even if Defendants' actions were negligent. 47 U.S.C. § 227 (b) (3).

53.     Even if Defendants did not intend to injure Plaintiff and the other class members, did not intend to violate their privacy, and did not intend to waste their valuable time with Defendants' advertisements, those facts are irrelevant because the TCPA is a strict liability statute.

54.     If Defendants' actions were knowing or willful, then the Court has the discretion to increase the statutory damages up to 3 times the amount. 47 U.S.C. § 227 (b) (3).

55.     Defendant Spreemo is liable for the fax advertisements at issue because it sent the faxes, caused the faxes to be sent, participated in the activity giving rise to or constituting the violation, the faxes were sent on its behalf, or its goods, products or services were promoted in the fax advertisement.

56.     Defendant Hartford is liable for the fax advertisements at issue because it participated in the activity giving rise to or constituting the violation, the faxes were sent on its behalf, or under general principles of vicarious liability, including actual authority (express or implied), apparent authority and ratification.

57.     Defendants' actions damaged Plaintiff and the other class members.

Receiving Defendants' junk faxes caused the recipients to lose paper and toner consumed in the printing of Defendants' faxes. Defendants used the fax machines of Plaintiff and the other class members. The subject faxes wasted Plaintiff's valuable time; time that otherwise would have been spent on Plaintiff's business activities. Defendants' faxes unlawfully interrupted Plaintiff and the other class members' privacy interests in being left alone. Finally, the injury and property damage sustained by Plaintiff and the other class members from the sending of unlawful fax advertisements occurred outside Defendants' premises.

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, demands judgment in its favor and against Defendants, jointly and severally, as follows:

A.   That the Court adjudge and decree that the present case may be properly maintained as a class action, appoint Plaintiff as the representative of the class, and appoint Plaintiff's counsel as counsel for the class;

B.   That the Court award $500.00 in statutory damages for each of Defendants' violations of the TCPA;

C.   That, if it finds either or both Defendants willfully or knowingly violated the TCPA, the Court exercise its discretion to increase the amount of the statutory damages award to an amount equal to not more than 3 times the amount (Plaintiff requests trebling);

D.   That the Court enter an injunction prohibiting Defendants from violating the TCPA in the future; and

E.     That the Court award costs and such further relief as the Court may deem just and proper.

## COUNT II
## CONVERSION

58.     Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

59.     Plaintiff brings Count II on behalf of itself and a class of similarly-situated persons and against Defendants.

60.     By sending advertisements to their fax machines, Defendants improperly and unlawfully converted the class's fax machines to Defendants' own use. Where printed (as in Plaintiff's case), Defendants also improperly and unlawfully converted the class members' paper and toner to Defendants' own use. Defendants also converted Plaintiff's time to Defendants' own use, as they did with the valuable time of the other class members.

61     Immediately prior to the sending of the unsolicited faxes, Plaintiff and the other class members each owned an unqualified and immediate right to possession of their fax machines, paper, toner, and employee time.

62.     By sending them unsolicited faxes, Defendants permanently misappropriated the class members' fax machines, toner, paper, and employee time to their own use. Such misappropriation was wrongful and without authorization.

63.     Defendants knew or should have known that their misappropriation of paper, toner, and employee time was wrongful and without authorization.

64.     Plaintiff and the other class members were deprived of the use of the

16

fax machines, paper, toner, and employee time, which could no longer be used for any other purpose. Plaintiff and each class member thereby suffered damages as a result of their receipt of unsolicited fax advertisements from Defendants.

65.    Defendants' unsolicited faxes effectively stole Plaintiff's employees' time because persons employed by Plaintiff were involved in receiving, routing, and reviewing Defendants' illegal faxes. Defendants knew or should have known employees' time is valuable to Plaintiff.

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, demands judgment in its favor and against Defendants, jointly and severally, as follows:

A.    That the Court adjudge and decree that the present case may be properly maintained as a class action, appoint Plaintiff as the representative of the class, and appoint Plaintiff's counsel as counsel for the class;

B.    That the Court award appropriate damages;

C.    That the Court award punitive damages;

D.    That the Court award attorney's fees;

E.    That the Court award costs of suit; and

F.    That the Court award such further relief as it may deem just and proper under the circumstances.

August 16, 2018

Respectfully submitted,

Robert W. Mauthe, M.D., P.C., a
Pennsylvania corporation, individually and
as the representative of a class of similarly-
situated persons

By: *Richard Shenkan / Daniel Cohen* (pro hac vice)
*by express permission*

One of its attorneys

Richard Shenkan (PA 79800)
Shenkan Injury Lawyers, LLC
P.O. Box 7255
New Castle, PA 16107
(412) 716-5800
(888) 769-1774 (fax)
rshenkan@shenkanlaw.com

One of its attorneys

Daniel J. Cohen (admitted pro hac vice )
Bock, Hatch, Lewis & Oppenheim, LLC
134 N. La Salle St., Ste. 1000
Chicago, IL 60602
(312) 658-5500
(312) 658-5555 (fax)
service@classlawyers.com

## Certificate of Service

The undersigned hereby certifies that, on August 17, 2018, he caused the foregoing to be served on the following attorneys of record by electronic mail:

Bart T. Murphy
Frederick A. Tecce
Bart.murphy@icemiller.com
Fred.tecce@icemiller.com

# EXHIBIT A



## Effective December 12, 2016

# The Hartford

# has contracted with Spreemo Health as their

# Primary Diagnostic Vendor

Dear Provider,

We are pleased to announce that The Hartford has added Spreemo as their primary Diagnostic Testing Vendor. *Effective December 12, 2016,* diagnostic studies (including but not limited to, MRI, CT, EMG studies, Arthrogram, Bone Scan, Myelogram) can be submitted through Spreemo, as follows:

1. **Phone: (800) 595-7173**
2. **Fax: (201) 289-5765**
3. **Email: referrals@spreemo.com**
4. **Online: https://express.spreemo.com/doc**

We look forward to a strong partnership and providing exceptional care for The Hartford patients.

If you have any questions or need further assistance, please contact us at (800) 595-7173.

Best Regards,

The Spreemo Team

Spreemo
88 Pine Street, 11th Floor
New York, NY 10005
T: 800.595.7173 • F: 201.289.5765

# EXHIBIT B

# BOCK, HATCH, LEWIS & OPPENHEIM, LLC

134 North La Salle Street, Suite 1000

Chicago, IL 60602

312-658-5500 (Phone) • 312-658-5555 (Fax)

**May 7, 2018**

In re: *Robert W. Mauthe, M.D., P.C. v. Spreemo, Inc. and The Hartford Financial Services Group* (ED Pennsylvania).

**Demand for Preservation of All Tangible Documents
Including Electronically Stored Information**

As part of the Class Action Complaint against Spreemo, Inc. and The Hartford Financial Services Group ("Defendants"), plaintiff, Robert W. Mauthe, M.D., P.C., hereby issues a demand for Defendant to preserve all tangible documents, including electronically stored information.

As used in this document, "you" and "your" refers to each Defendant, and its predecessors, successors, parents, subsidiaries, divisions or affiliates, and its respective officers, directors, agents, attorneys, accountants, employees, partners or other persons occupying similar positions or performing similar functions.

You should anticipate that much of the information subject to disclosure or responsive to discovery in this matter is stored on your current and former computer systems and other media and devices (including personal digital assistants, voice-messaging systems, online repositories and cell phones).

Electronically stored information (hereinafter "ESI") should be afforded the broadest possible definition and includes (by way of example and not as an exclusive list) potentially relevant information electronically, magnetically or optically stored as:

• Digital communications (e.g., e-mail, voice mail, instant messaging);
• Word processed documents (e.g., Word or WordPerfect documents and drafts);
• Spreadsheets and tables (e.g., Excel or Lotus 123 worksheets);
• Accounting Application Data (e.g., QuickBooks, Money, Peachtree data files);
• Image and Facsimile Files (e.g., .PDF, .TIFF, .JPG, .GIF images);
• Sound Recordings (e.g., .WAV and .MP3 files);
• Video and Animation (e.g., .AVI and .MOV files);
• Databases (e.g., Access, Oracle, SQL Server data, SAP);

1

- Contact and Relationship Management Data (e.g., Outlook, ACT!);
- Calendar and Diary Application Data (e.g., Outlook PST, Yahoo, blog tools);
- Online Access Data (e.g., Temporary Internet Files, History, Cookies);
- Presentations (e.g., PowerPoint, Corel Presentations)
- Network Access and Server Activity Logs;
- Project Management Application Data;
- Computer Aided Design/Drawing Files; and,
- Back Up and Archival Files (e.g., Zip, .GHO)

ESI resides not only in areas of electronic, magnetic and optical storage media reasonably accessible to you, but also in areas you may deem not reasonably accessible. You are obliged to preserve potentially relevant evidence from both these sources of ESI, even if you do not anticipate producing such ESI.

The demand that you preserve both accessible and inaccessible ESI is reasonable and necessary. Pursuant to amendments to the Federal Rules of Civil Procedure that have been approved by the United States Supreme Court (eff. 12/1/05), you must identify all sources of ESI you decline to produce and demonstrate to the court why such sources are not reasonably accessible. For good cause shown, the court may then order production of the ESI, even if it finds that it is not reasonably accessible. Accordingly, even ESI that you deem reasonably inaccessible must be preserved in the interim so as not to deprive the plaintiffs of their right to secure the evidence or the Court of its right to adjudicate the issue.

### A.    Preservation Requires Immediate Intervention

You must act immediately to preserve potentially relevant ESI regarding the time period of May 2013 to the date You receive this letter. Potentially relevant ESI includes, but is not limited to information:

1. Regarding the events and causes of action described in Plaintiff's Class Action Complaint; and
2. Regarding Your claims or defenses to Plaintiff's Class Action Complaint.

Adequate preservation of ESI requires more than simply refraining from efforts to destroy or dispose of such evidence. You must also intervene to prevent loss due to routine operations and employ proper techniques and protocols suited to protection of ESI. Be advised that sources of ESI are altered and erased by continued use of your computers and other devices. Booting a drive, examining its contents or running any application will irretrievably alter the evidence it contains and may constitute unlawful spoliation of evidence. Consequently, alteration and erasure may result from your failure to act diligently and responsibly to prevent loss or corruption of ESI. Nothing in this demand for preservation of ESI should be understood to diminish your

concurrent obligation to preserve document, tangible things and other potentially relevant evidence.

## B.      Suspension of Routine Destruction

You are directed to immediately initiate a litigation hold for potentially relevant ESI, documents and tangible things, and to act diligently and in good faith to secure and audit compliance with such litigation hold. You are further directed to immediately identify and modify or suspend features of your information systems and devices that, in routine operation, operate to cause the loss of potentially relevant ESI. Examples of such features and operations include:

• Purging the contents of e-mail repositories by age, capacity or other criteria;
• Using data or media wiping, disposal, erasure or encryption utilities or devices;
• Overwriting, erasing, destroying or discarding back up media;
• Re-assigning, re-imaging or disposing of systems, servers, devices or media;
• Running antivirus or other programs effecting wholesale metadata alteration;
• Releasing or purging online storage repositories;
• Using metadata stripper utilities;
• Disabling server or IM logging; and,
• Executing drive or file defragmentation or compression programs.

## C.      Guard Against Deletion

You should anticipate that your employees, officers or others may seek to hide, destroy or alter ESI and act to prevent or guard against such actions. Especially where company machines have been used for Internet access or personal communications, you should anticipate that users may seek to delete or destroy information they regard as personal, confidential or embarrassing and, in so doing, may also delete or destroy potentially relevant ESI. This concern is not one unique to you or your employees and officers. It's simply an event that occurs with such regularity in electronic discovery efforts that any custodian of ESI and their counsel are obliged to anticipate and guard against its occurrence.

## D.      Preservation by Imaging

You should take affirmative steps to prevent anyone with access to your data, systems and archives from seeking to modify, destroy or hide electronic evidence on network or local hard drives (such as by deleting or overwriting files, using data shredding and overwriting applications, defragmentation, re-imaging or replacing drives, encryption, compression, steganography or the like). With respect to local hard drives, one way to protect existing data on local hard drives is by the creation and authentication of a forensically qualified

3

image of all sectors of the drive. Such a forensically qualified duplicate may also be called a bitstream image or clone of the drive. Be advised that a conventional back up of a hard drive is not a forensically qualified image because it only captures active, unlocked data files and fails to preserve forensically significant data that may exist in such areas as unallocated space, slack space and the swap file.

With respect to the hard drives and storage devices of each of the persons named below and of each person acting in the capacity or holding the job title named below, as well as each other person likely to have information pertaining to the instant action on their computer hard drive(s), demand is made that you immediately obtain, authenticate and preserve forensically qualified images of the hard drives in any computer system (including portable and home computers) used by that person during the period from May 2013 to today's date as well as recording and preserving the system time and date of each such computer.

Once obtained, each such forensically qualified image should be labeled to identify the date of acquisition, the person or entity acquiring the image and the system and medium from which it was obtained. Each such image should be preserved without alteration.

### E.    Preservation in Native Form

You should anticipate that certain ESI, including but not limited to spreadsheets and databases, will be sought in the form or forms in which it is ordinarily maintained. Accordingly, you should preserve ESI in such native forms, and you should not select methods to preserve ESI that remove or degrade the ability to search your ESI by electronic means or make it difficult or burdensome to access or use the information efficiently in the litigation. You should additionally refrain from actions that shift ESI from reasonably accessible media and forms to less accessible media and forms if the effect of such actions is to make such ESI not reasonably accessible.

### F.    Metadata

You should further anticipate the need to disclose and produce system and application metadata and act to preserve it. System metadata is information describing the history and characteristics of other ESI. This information is typically associated with tracking or managing an electronic file and often includes data reflecting a file's name, size, custodian, location and dates of creation and last modification or access. Application metadata is information automatically included or embedded in electronic files but which may not be apparent to a user, including deleted content, draft language, commentary, collaboration and distribution data and dates of creation and printing. Be advised that metadata may be overwritten or corrupted by careless

handling or improper steps to preserve ESI. For electronic mail, metadata includes all header routing data and Base 64 encoded attachment data, in addition to the To, From, Subject, Received Date, CC and BCC fields.

### G.    Servers

With respect to servers like those used to manage electronic mail (e.g., Microsoft Exchange, Lotus Domino) or network storage (often called a user's "network share"), the complete contents of each user's network share and e-mail account should be preserved. There are several ways to preserve the contents of a server depending upon, e.g., its RAID configuration and whether it can be downed or must be online 24/7. If you question whether the preservation method you pursue is one that we will accept as sufficient, please call to discuss it.

### H.    Home Systems, Laptops, Online Accounts and Other ESI Venues

Though we expect that you will act swiftly to preserve data on office workstations and servers, you should also determine if any home or portable systems may contain potentially relevant data. To the extent that officers, board members or employees have sent or received potentially relevant e-mails or created or reviewed potentially relevant documents away from the office, you must preserve the contents of systems, devices and media used for these purposes (including not only potentially relevant data from portable and home computers, but also from portable thumb drives, CD-R disks and the user's PDA, smart phone, voice mailbox or other forms of ESI storage.). Similarly, if employees, officers or board members used online or browser-based email accounts or services (such as AOL, Gmail, Yahoo Mail or the like) to send or receive potentially relevant messages and attachments, the contents of these account mailboxes (including Sent, Deleted and Archived Message folders) should be preserved.

### I.    Ancillary Preservation

You must preserve documents and other tangible items that may be required to access, interpret or search potentially relevant ESI, including logs, control sheets, specifications, indices, naming protocols, file lists, network diagrams, flow charts, instruction sheets, data entry forms, abbreviation keys, user ID and password rosters or the like.

You must preserve any passwords, keys or other authenticators required to access encrypted files or run applications, along with the installation disks, user manuals and license keys for applications required to access the ESI. You must preserve any cabling, drivers and hardware, other than a standard 3.5" floppy disk drive or standard CD or DVD optical disk drive, if needed to access

or interpret media on which ESI is stored. This includes tape drives, bar code readers, Zip drives and other legacy or proprietary devices.

### J.    Paper Preservation of ESI is Inadequate

As hard copies do not preserve electronic searchability or metadata, they are not an adequate substitute for, or cumulative of, electronically stored versions. If information exists in both electronic and paper forms, you should preserve both forms.

### K.    Agents, Attorneys and Third Parties

Your preservation obligation extends beyond ESI in your care, possession or custody and includes ESI in the custody of others that is subject to your direction or control. Accordingly, you must notify any current or former agent, attorney, employee, custodian or contractor in possession of potentially relevant ESI to preserve such ESI to the full extent of your obligation to do so, and you must take reasonable steps to secure their compliance.

### L.    System Sequestration or Forensically Sound Imaging

We suggest that, with respect to Defendant removing their ESI systems, media and devices from service and properly sequestering and protecting them may be an appropriate and cost-effective preservation step. In the event you deem it impractical to sequester systems, media and devices, we believe that the breadth of preservation required, coupled with the modest number of systems implicated, dictates that forensically sound imaging of the systems, media and devices is expedient and cost effective. As we anticipate the need for forensic examination of one or more of the systems and the presence of relevant evidence in forensically accessible areas of the drives, we demand that you employ forensically sound ESI preservation methods. Failure to use such methods poses a significant threat of spoliation and data loss.

By "forensically sound," we mean duplication, for purposes of preservation, of all data stored on the evidence media while employing a proper chain of custody and using tools and methods that make no changes to the evidence and support authentication of the duplicate as a true and complete bit-for-bit image of the original. A forensically sound preservation method guards against changes to metadata evidence and preserves all parts of the electronic evidence, including the so-called "unallocated clusters," holding deleted files.

### M.    Preservation Protocols

We are desirous of working with you to agree upon an acceptable protocol for forensically sound preservation and can supply a suitable protocol,

if you will furnish an inventory of the systems and media to be preserved. Else, if you will promptly disclose the preservation protocol you intend to employ, perhaps we can identify any points of disagreement and resolve them. A successful and compliant ESI preservation effort requires expertise. If you do not currently have such expertise at your disposal, we urge you to engage the services of an expert in electronic evidence and computer forensics. Perhaps our respective expert(s) can work cooperatively to secure a balance between evidence preservation and burden that's fair to both sides and acceptable to the Court.

## N.     Do Not Delay Preservation

I'm available to discuss reasonable preservation steps; however, you should not defer preservation steps pending such discussions if ESI may be lost or corrupted as a consequence of delay. Should your failure to preserve potentially relevant evidence result in the corruption, loss or delay in production of evidence to which we are entitled, such failure would constitute spoliation of evidence, and we will not hesitate to seek sanctions.

## O.     Confirmation of Compliance

Please confirm that you have taken the steps outlined in this letter to preserve ESI and tangible documents potentially relevant to this action. If you have not undertaken the steps outlined above, or have taken other actions, please describe what you have done to preserve potentially relevant evidence.


Respectfully,



Phillip A. Bock
Bock, Hatch, Lewis & Oppenheim, LLC
134 N. LaSalle St., Suite 1000
Chicago, IL 60602
512-739-0390 (cell)
312-658-5515 (direct)
todd@classlawyers.com

# EXHIBIT C





When your health is on the line, quality care makes all the difference. But how do you find the care you need when you need it the most?



By combining advanced data science and machine learning techniques with the latest clinical research, Spreemo Health is answering this question, all while driving the emerging science of quality.



## QUALITY VARIABILITY IN ADVANCED IMAGING

Misdiagnoses in radiology are prevalent, and often lead to inappropriate care, poor patient

outcomes, and increased costs. Leading research conducted in collaboration with Hospital for Special Surgery and published in the *Spine Journal* has demonstrated error rates as high as 43% for musculoskeletal imaging.



SPINE JOURNAL STUDY: VARIABILITY IN ERROR RATES FOR MRI



Spreemo Health connects employees and their loved ones to local Radiology Centers of Excellence all across the country, ensuring that each patient receives the most accurate diagnosis, resulting in the right treatment at the right time.



# Helping patients find the right doctor, doctors deliver the right care, and payers find the best value.



## PRESS HIGHLIGHTS

‹  ›



Think Advisor



Spreemo Health
Announces
Strategic
Partnership with
One Call Care
Management

You Can't Afford
Low-Quality
Health Care

Spreemo Health
Expands
High-Quality
Diagnostics
Offerings to
Combat
Inappropriate
Care and
Unnecessary
Surgery

**SEE MORE PRESS**

info@spreemohealth.com
Copyright © 2018 Spreemo, Inc. All rights reserved.

8/16/18 3:36 PM

# EXHIBIT D

SEARCH

Join   Log In
AngelList

Startup Jobs
Recruit
Invest
More
Companies Incubators
Track
Salaries Valuations
Help
Companies Incubators
Track
Salaries Valuations
Help

Search

Spreemo Health is on AngelList, where the world meets startups.
To connect with Spreemo Health, sign up for AngelList today.
Sign up Log in



# Spreemo Health

## Combining machine learning and clinical research to improve patient care and outcomes

Share
Sign up to see how you are connected to Spreemo Health
There was a problem loading your content.

## Product





[Video](#)

Spreemo Health is a healthcare analytics company that assesses and develops data-driven metrics around diagnostic accuracy and quality. Spreemo Health works with employers and payers to connect their members with the highest-value radiology providers nationwide, improving outcomes for patients and reducing total medical spend for payers. Through its clinical research and advanced data science capabilities, Spreemo Health is at the forefront of the emerging science of quality and shift towards value-based healthcare.

## Funding

- Seed
  Jan 31, 2018
  $6,000,000

## Team

### Employees



- [Daniel Elgort](#)

Case 5:18-cv-01902-CFK   Document 23   Filed 08/17/18   Page 40 of 49

VP, Healthcare Analytics and Research



[Julian Yao](#)
Product and Growth

Product & Growth [@Spreemo Health](#) | Former healthcare strategy consultant [@Accenture](#) | [@Rice University](#) Alum | Improving healthcare through data science and ML



[Jennifer Williams](#)
Director of Finance

Director of Finance

[View all 11 Employees](#)

## Past Employees



[Dan Kohn](#)
CTO

Serial entrepreneur and Internet technologist, leading the open source software foundation that

Case 5:18-cv-01902-CFK    Document 23    Filed 08/17/18    Page 41 of 49

hosts Kubernetes.



- [Arthur Kah-Git Wong](#)
  Director of Engineering and Project Management

  Interested in disrupting traditional, petroleum-based, passenger vehicles and associated industries.



- [Andre Perunicic](#)
  Senior Data Scientist

  Founder at Intoli. Helped define and measure quality of MRI exams and radiology services at Spreemo Health. Ph.D. in math from Brandeis, two years a postdoc.

[View all 30 Past Employees](#)
[New York City](#)
[Big Data](#) · [Healthcare](#) · [Machine Learning](#) · [Health Care Information Technology](#)
11-50 employees
[www.spreemohealth.com](#)
Jobs
Spreemo Health hasn't added any jobs yet.
[Notification Set](#)
[Get Notified](#)
Which position are you applying for?

Add a message to Spreemo Health

Write a note to Julian Yao at    [ Apply ]

[See Similar Jobs](#)
[Help](#) · [Companies](#) · [Jobs by Location](#) · [Jobs by Market](#) · [Jobs by Role](#) · [Blog](#) · [Twitter](#) · [Terms & Risks](#) · [Privacy Policy & Cookies](#) · [Unsubscribe](#) · [Press](#) · Profile not verified

# EXHIBIT E













Women in Health Tech
womeninhealthtech.splashthat.com

12 Likes

Like   Comment   Share

Spreemo Health
968 followers
11mo

**NPR** cites our research illustrating care variability in response to **Anthem**'s new imaging policy. Using advanced data science and machine learning techniques, we are solving this problem by identifying the right physician for each pati ...see more

Anthem Says No To Many Scans Done By Hospital-Owned Clinics
npr.org

5 Likes

Like   Comment   Share

Spreemo Health
968 followers
11mo

**Leah Binder**, President and CEO of The Leapfrog Group, cited our study on MRI quality variability in discussing Anthem's new policy on imaging facilities: "Price isn't the only important variable, and the perception that all imaging st ...see more

Need An MRI? Anthem Directs Most Outpatients To Independent Centers

